UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARIAN MUDD-LIERMAN,

                Plaintiff,

v.                                        Case No.  5:05-cv-85-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.

_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for social security disability insurance benefits and Supplemental Security Income. The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 14 &15.) For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **REVERSED AND REMANDED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for social security disability insurance benefits on July 26, 2001 (R. 80) and SSI on July 27, 2001 (R. 58-60, 237), alleging an onset date of June 30, 2000. (R. 117.) Plaintiff's claim was denied initially and upon reconsideration. (R. 59, 61-62, 65.) Plaintiff requested a hearing before an Administrative Law Judge (the "ALJ") which was held on September 17, 2003. (R. 29-57.) By decision dated November 13, 2003, ALJ Franklin D. Holder found Plaintiff was not disabled. (R. 18-25.)

Plaintiff's request for review of that decision was denied by the Appeals Council, rendering the decision of the ALJ the final decision of the Commissioner.

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
    In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.")

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A.  Personal and Occupational Background

Plaintiff, born on October 1, 1961, was forty-two years old at the time of the hearing. (R. 32.) She completed high school and six months at Webster College where she studied accounting, but has received no other vocational training. (R. 33, 123.)

Prior to her onset date, Plaintiff worked at Maximum Security, a security alarm company, monitoring alarms at businesses and residences and completing incident reports. (R. 34-35.) She spent most of the day sitting at a desk (R. 111), but resigned from this job due to leg and back pain. (R. 117.)  Prior to her employment at Maximum Security, Plaintiff worked for two years as a school bus driver for Marion County. (R. 36-

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

37.) As a bus driver, she worked four hours a day, sitting for three hours, and walking for one. She lifted objects weighing less than ten pounds. (R. 110.)

Plaintiff also previously had worked as a coordinator for a direct mailing company (R. 37) and as a licensed day care provider. (R. 38.) As a direct mailing coordinator, she spent about four to five hours a day sitting and one to two hours walking or standing. Her duties included filling out and processing work orders and supervising another person with these tasks. She frequently lifted objects of less than ten pounds, but occasionally lifted objects of up to twenty pounds. (R. 109, 118.) As a day care provider, Plaintiff prepared meals and planned activities for up to ten children six days a week. In this job, she spent about an hour walking, sitting, and crawling and about two hours standing or in a stooped position. The heaviest objects she lifted (including children) weighed fifty pounds while those she frequently lifted weighed only twenty-five pounds. (R. 108.)

## B.  Back pain

The primary issues raised on appeal concern whether the ALJ properly evaluated medical evidence of Plaintiff's back problems and subsequent pain. As a result, this summary of the record will concentrate on the evidence discussing Plaintiff's back pain.[21]

### 1.  Plaintiff's Hearing Testimony and Daily Activities

Due to back problems at L4-L5, Plaintiff had a diskectomy performed in 1995.  In 1998, she re-injured her back when she slipped on the school bus. (R. 40-41.)

---

[21] Plaintiff also received treatment for, and claimed disability due to, morbid obesity and depression.

Plaintiff stated that she is continually in pain with a burning sensation, cramping, and numbness in her legs. Although she tries to walk and exercise in the pool or accomplish other tasks, this burning sensation causes her to cease any activity. (R. 42-44, 50, 90, 91, 99.) She claims she cannot walk more than five minutes, stand more than ten to fifteen minutes, but she can sit fifteen to twenty minutes as long as she changes position. (R. 42-44, 91.) Plaintiff also testified at the hearing that she does not lift more than five pounds. (R. 51.)

Plaintiff attempts to clean objects at waist level during the day, but she frequently has to lay down for fifteen to thirty minutes after performing such small tasks. (R. 44, 88, 92, 100-03.) She claims she naps for four to four and one- half hours and spends about thirteen hours in bed resting during the day. She has trouble sleeping at times due to pain. (R. 46-47, 92 100.) Plaintiff also testified that she was taking the medications Hydrocodone, Skelaxin, and Elavil which cause drowsiness about one-half hour after she takes them. (R. 48.)

Plaintiff claims that she cannot put clothes into, nor take them out of, the dryer due to their weight and difficulty bending. (R. 45, 100-04.) She needs help grocery shopping for similar reasons. (R. 87, 92, 100-103.) She cannot drive more than five to ten minutes due to numbness in her legs, but she can do some light cooking with help. (R. 45, 87, 92, 100-04.) She likes to read and can do paint by number pictures in short intervals. She testified that her concentration is affected by the pain and she has low

energy.[22] (R. 49, 93, 104.) She is no longer as active or social as she once was, but continues to get along well with friends and family and occasionally attend her son's baseball games. (R. 49-50, 88-89, 101, 104.)

## 2. Medical Opinion Evidence

On October 4, 2001, Dr. Mario Medero examined Plaintiff at the request of the Office of Disability Determinations. In his functional assessment of Plaintiff, he found that Plantiff's spinal range of motion was normal except for decreased flexion at the waist to 30 degrees. Her motor, sensory, and reflex findings were all normal. No muscle spasm was noted, but Plaintiff's straight and seated leg raises were positive on the right at forty degrees. Plaintiff's gait was normal and she could walk unassisted. Dr. Medero also found her grip strength and fine manipulation to be within normal limits. (R. 146.)

Based on this assessment and an x-ray of Plaintiff' spine showing moderate degeneration at L4-5 with decreased disc height, the agency physician in October of 2001 found Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand and/or walk at least two hours in an eight hour workday, sit about six hours in an eight hour workday and had unlimited push and/or pull abilities in her extremities. With respect to postural limitations, he noted that Plaintiff should never climb a ladder/rope/scaffold, but could frequently balance and kneel and occasionally stoop, crouch, and crawl. He noted that the finding of degenerative disc disease would affect her bending and stooping abilities. (R.149.)

---

[22] In 2001, Plaintiff earlier stated in forms completed for the Office of Disability Determinations that the pain does not usually interfere with her concentration or ability to complete tasks. (R. 104-05.) At that time, she was not on any medication, claiming nothing helped relieve her pain. (R. 99.)

In February of 2002, Dr. Barry Kaplan, a treating physician, recommended use of Neurontin and physical therapy for Plaintiff's back and leg pain. He noted degenerative disc disease at L4-5 and mild foraminal compression. (R. 159.) In 1999, Dr. Kaplan treated Plaintiff for persistent back pain and noted she was to remain on sedentary status and not to  work as a school bus driver. (R. 222-227.) In 2000, Dr. Kaplan had previously recommended that Plaintiff undergo physical therapy rehabilitation for her back and a weight loss program, but he did not recommend surgery.  (R. 221-234.)

In March of 2002, Dr. Dantuluri P. Raju, a consultative examiner, found Plaintiff could walk unassisted, though had a stiff gait. She had a normal range of motion in her cervical spine, but a more limited range in her lumbar spine with noted stiffness and tenderness. The physician did not observe muscle spasm but noted sluggish deep tendon reflexes in all of her extremities. All motor and sensory functions were intact with good power and an absence of muscle wasting. (R. 162.)

In April of 2002, Dr. Collins, an agency physician, completed an RFC assessment. He agreed with all of the findings in the previous agency RFC assessment concerning Plaintiff's exertional limitations. With respect to her postural limitations, he found that Plaintiff could only occasionally climb, balance, stoop or crouch, but should never kneel or crawl. (R. 181.)  While the previous assessment found Plaintiff had no environmental limitations, the current assessment noted that Plaintiff should avoid hazards such as machinery and heights. (R. 183.)

### 3. Treating Physician Assessment

In June of 2003, Plaintiff was examined by Pam Edwards, ARNP, at the office of Dr. DiSanti. The ARNP noted paraspinal tenderness, palpable bulges, and Plaintiff's

complaints of a burning sensation down the back of both legs.[23] Plaintiff was prescribed 800 mg of Motrin for pain and 750 mg of Robaxin for spasms. (R. 187.) In September of 2003, Plaintiff's attorney asked her treating physician, Dr. DiSanti, to complete a Medical Assessment of Plaintiff's Ability to do Work-Related Activities. (R. 194.) Dr. DiSanti stated that Plaintiff could only lift or carry less than five pounds due to herniated discs at L3-4 and L5-S1 which impinge on the anterior spinal cord and weakness in Plaintiff's legs. (R. 194.) The physician noted that Plaintiff only could stand and/or walk for less than one hour in an eight hour workday and only fifteen to thirty minutes without interruption due to bilateral radicular pain in her legs which radiates to her feet, causing numbness. (R. 195.) Dr. Disanti also opined that Plaintiff only could sit for less than one hour in an eight hour workday and without interruption for only fifteen to thirty minutes because Plaintiff is unable to sit without frequently changing position to relieve pain.

With respect to postural limitations, Dr. DiSanti noted that Plaintiff could occasionally balance but should never assume any of the other postural positions (*e.g.* climbing, stooping, crouching, kneeling, or crawling). (R. 195.) However, Dr. Disanti commented that the numbness in Plaintiff's feet could cause potential balance problems and interfered with her ability to feel. Plaintiff's pushing and pulling abilities were also impaired because such actions aggravate a lumbar herniated disc viewed on the MRI and cause her considerable back pain. (R. 196.) Dr. Disanti explicitly stated that "Pt. is unable to lift, carry, bend, squat, climb, twist, stand, sit or walk for any prolonged period of time due to pain or weakness in legs." (R. 196.) Plaintiff also was directed to rest

---

[23] On July 18, 2003, Plaintiff was examined at Express Care of Belleview where tenderness in Plaintiff's lumbar spine and radiculopathy were also noted. (R. 220.)

10

every one to two hours for fifteen to thirty minutes, elevating her legs during this time to alleviate pain. (R. 196-97.) Dr. Disanti based this part of the assessment on the fact that during the examination Plaintiff was in "significant pain," which increased with the physical motions described above. Plaintiff also had a positive straight leg raise at thirty degrees and the doctor noted that her pain was relieved only through frequent changes in position. (R. 196.) With respect to environmental restrictions, Dr. Disanti recommended that Plaintiff avoid heights and machinery to prevent self injury, and vibrations to prevent pain. Dr. DiSanti found it reasonable that Plaintiff had to lie down to alleviate pain and fatigue for one to two hours a day and also noted that Plaintiff took narcotic pain medication and muscle relaxers which cause drowsiness. (R. 198.)

### 4. MRI's and X-Rays

In September of 1995, an MRI revealed a disc herniation at L5-S1 residing in the epidural fat and large disc herniation at L4-L5 causing impingement on the anterior spinal canal and considerable stenosis. (R. 158.)

In June of 1998, two years before her alleged onset, an MRI of Plaintiff's lumbar spine revealed normal alignment with thinning of L4-L5, and marginal spurring at L3-L4, L4-L5, and L5-S1 disc levels. Within the spinal canal at L3-L4 there was a small right-sided focal herniation narrowing the right lateral recess and neural foramina. It was noted that a postoperative L4-L5 midline annulus bulge and hypertrophic spurring without stenosis were present. (R.156.)

An MRI performed on October 20, 1998, revealed disc desiccation at L3-L4 with a right parasagittal disc herniation causing spinal stenosis, right lateral recess, and foraminal narrowing. There was postsurgical scarring posterior to the disc at L3-L4

causing impingement on the anterior spinal canal and right lateral recess. Disc degeneration and previous surgical intervention were noted at this level as was disc desiccation at L5-S1 with a disc bulge. (R. 157.)

An x-ray taken on January 14, 2002 revealed that Plaintiff had mild central canal stenosis at L4-5 due to severe circumferential disc bulge, and posterior osteophyte, ligamentum flavum, and facet hypertrophic changes. (R. 235.)

The radiologist, who analyzed an MRI of Plaintiff's lumbar spine in September of 2003, found degenerative arthritis, degenerative endplate changes at L4-5, disc degeneration at L3-4 with a broad based herniation with mild impingement on the anterior spinal canal, evidence of a previous laminectomy at L4-5 with re-protrusion of the disc with narrowing of the left lateral recess, a second disc herniation and dessication at L5-S1, and disc degeneration at L3-4 and L4-5. (R. 193.)

## IV.  DISCUSSION

Plaintiff challenges the ALJ's findings on two primary grounds. First, Plaintiff contends that the ALJ erred in failing to accord adequate weight to the opinion and assessment of Plaintiff's treating physician, Dr. DiSanti. Second, the Plaintiff asserts that the ALJ failed to properly apply the Eleventh Circuit pain standard to evaluate Plaintiff's subjective complaints of pain.

## A.  Treating Physician

"The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician," and give "the testimony of a treating physician . . . substantial or

considerable weight unless 'good cause' is shown to the contrary."[24] The Eleventh Circuit has defined "good cause" to encompass situations where the doctor's opinion was not bolstered by the evidence, where the evidence supports a contrary finding, and where the doctor's opinion was conclusory or inconsistent with his own records. [25]

In the instant case, the ALJ acknowledged that while the opinion of a treating physician is usually accorded greater weight than the opinion of other medical examiners, he found that Dr. DiSanti's opinion was at odds with the opinions of the two state agency physicians and was "extreme" when compared to the clinical findings. An examination of the record discloses that the ALJ's finding that Dr. DiSanti's opinion is not consistent with the clinical findings is not based on substantial evidence. To the contrary, Dr. DiSanti's assessment is based on medical and clinical findings that support his opinions.

As a basis for his conclusion that the clinical findings do not support Dr. DiSanti's opinions the ALJ stated that the Plaintiff has a normal gait, full range of motion of her extremities, full range of motion of her cervical spine and normal and fine gross manipulation. This finding was based on the examinations by consultative examiners, Drs. Raju and Medero, who noted that Plaintiff "has a normal gait, full range of motion of her extremities, full range of motion of her cervical spine and normal fine and gross manipulation." Further, the ALJ noted that both doctors found Plaintiff did not have muscle spasms in her lumbar spine nor gross deficits in motor or sensory functions.

---

[24] Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

[25] *Id.*

Although, Dr. Medero and Dr. Raju made these findings there were other findings in Dr. Medero's report - not mentioned by the ALJ - that were not at odds with Dr. Santi's opinion. For example, Dr. Medero found that Plaintiff had decreased flexion at her waist to thirty degrees and had positive straight and seated leg raises on the right leg at forty degrees. Similarly, Dr. Raju found that Plaintiff had a stiff gait and a more limited range of motion in her lumbar spine than in her cervical spine with stiffness and tenderness.

Most notably, however, Dr. DiSanti's assessment was based upon objective medical evidence and clinical testing, that is absent from the opinions of the consultative examiners. For example, Dr. DiSanti based his assessment on a current MRI performed in 2003, Plaintiff's medical history,[26] and on an examination completed before the hearing. Further, Dr. DiSanti's assessment addressed Plaintiff's complaints of pain radiating into her legs. Dr. DiSanti specifically opined that Plaintiff's radicular pain would limit the amount of time Plaintiff could stand and/or walk to less one hour, or only fifteen to thirty minutes uninterrupted. Dr. DiSanti also noted that the pain experienced by Plaintiff causes numbness in Plaintiff's feet which affects Plaintiff's balance and ability to feel. Lastly, Dr. Disanti also found that Plaintiff would need frequent rest periods for fifteen to thirty minutes every one to two hours due to pain which was apparent during her examination and he found the presence of a positive straight leg raise test.

In contrast neither of the consultative examiners addressed Plaintiff's complaints of pain radiating into her legs or the results of the MRI. Moreover, none of

---

[26] Plaintiff asserts that Dr. DiSanti has been her treating physician since 1998 although the evidence in the record only includes the doctor or staff's treatment of Plaintiff in 2003. Doc. 14 at 11.

the physicians relied upon by the ALJ noted the impact of the radiculopathy on Plaintiff's ability to stand, walk, or balance.

Dr. DiSanti also found that Plaintiff could not lift more than five pounds and had limited push and pull abilities due to two herniated discs apparent on the MRI. While Dr. Raju found Plaintiff had good power and an absence of muscle wasting, Dr. Raju's finding is not contrary to Dr. DiSanti's opinion that Plantiff cannot lift heavy items because this exacerbates the two herniated discs causing back pain. Dr. DiSanti also opined that Plaintiff should avoid work conditions where she would be exposed to vibrations which could cause pain. No other consultative physician noted this restriction. And the ALJ significantly failed to state why he was disregarding this environmental restriction of the treating physician.

Accordingly, the clinical evidence of record supports the opinion of Dr. DiSanti rather than establishing that his opinion is at odds with the clinical findings. As such, the ALJ's statement that Dr. Santi's opinion is extreme as compared to the clinical findings is not based on substantial evidence of record and, thus, the ALJ's analysis is not consistent with the rule that the ALJ is required to accord significant weight to the opinion of the treating physician.

Moreover, the ALJ's implicit reliance on the assessments by two state agency physicians as substantial evidence to reject the opinion of Dr. DiSanti was also error because the state agency physicians did not have the benefit of reviewing the records of the three last MRI's, including the September 4, 2003 MRI, which disclosed disk degeneration and herniation impinging on the spinal canal - one of the key clinical findings relied upon by Dr. Santi. Although the opinions of state agency physicians are

15

an acceptable medical source, where as here, the treating physician has the benefit of clinical testing and other objective medical evidence, such as MRI's, that were not reviewed by the state agency physicians, the opinions of the state agency physicians do not constitute substantial evidence sufficient to support a finding by the ALJ not to accord significant weight to the opinion of a treating physician.

Accordingly, for all of these reasons, the ALJ committed reversible error by failing to accord controlling weight to the opinion of Dr. DiSanti.

## B.  The Pain Standard

Secondly, Plaintiff asserts that the ALJ erred in discrediting Plaintiff's subjective complaints of pain based solely on the ALJ's assessment of Plaintiff's ability to perform activities of daily living. Plaintiff also contends that the ALJ misrepresented the extent of those activities in his opinion and improperly rejected the side effects of Plaintiff's pain medication without conducting any analysis. The Court agrees that the ALJ also erred by failing properly to articulate sufficient reasons supported by substantial evidence for rejecting Plaintiff's subjective complaints of pain.

Pain is a non-exertional impairment.[27] Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.[28] Pain

---

[27] Foote, 67 F.3d at 1559.

[28] 42 U.S.C. § 423(d)(5)(A).

alone can be disabling, even when its existence is unsupported by objective evidence,[29] although an individual's statements regarding pain do not provide conclusive evidence of a disability.[30] The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[31]

An ALJ must apply the Eleventh Circuit's "pain standard" when, as here, a claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms.[32] In order to establish a disability based on testimony of pain and other symptoms, the pain standard requires: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[33]

The ALJ found that the Plaintiff suffers from degenerative disc disease of the lumbar spine, the underlying medical condition causing her pain. However, the ALJ did not evaluate the objective medical evidence to confirm the severity of the alleged pain or find that her degenerative disc disease was of such severity to give rise to pain. Instead, the ALJ discredited Plaintiff's subjective complaints of pain solely on the fact

---

[29] See Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

[30] 42 U.S.C. § 423(d)(5)(A).

[31] 20 C.F.R. § 404.1528.

[32] Foote, 67 F.3d at 1560.

[33] Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).

that "[s]he lives a sedentary type lifestyle, which is consistent with the medical evidence" and that

> [t]he claimant is able to take care of her personal needs, dust, do dishes, do laundry, cook and drive. She reported that she is able to go to the grocery store and occasionally go to her son's ball games. She can read, paint by numbers and watch television. She can manage her funds and gets along great with family and friends.

(R. 23.) While these activities may be relevant in a very general sense to the ALJ's analysis, they are neither specific nor fully supported by an examination of the record.

The ALJ "must articulate explicit *and adequate* reasons" for rejecting Plaintiff's subjective complaints of pain.[34] While an individual's daily activities may be assessed by the ALJ to evaluate a Plaintiff's credibility,[35] Plaintiff's descriptions of the extent of her daily living activities in this case are not inconsistent with her complaints of persistent and severe back pain.  Furthermore, "participation in everyday activities of short duration, such as housework ..." do not disqualify a claimant from disability.[36]

For example, while Plaintiff generally reported that she could take care of her personal needs, when commenting with regard to her habits of bathing, hair care and washing, she reported that she cannot stand long enough to blow dry her hair nor bend over to wash the bottom of her legs. (R. 88, 45.) With regard to her daily routine, Plaintiff testified that she will get up in the morning and try to do "miscellaneous things around

---

[34] Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)) (emphasis added).

[35] Social Security Ruling 96-7P, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's statements, 61 Fed. Reg. 34483, 34485 (July 2, 1996).

[36] Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997).

the house . . . like wipe down the counter" but then has to go lie down after fifteen to thirty minutes of activity. (R. 44.) She stated that she can only clean objects at waist level, like the counter, because she cannot bend over. (R. 92.) When she washes dishes, although she can load the dishwasher, someone else has to put the dishes away. (R. 45.) When Plaintiff does laundry she only can put clothes in the washer because the wet clothes are too heavy for her to put in the dryer and, once again, she cannot bend over. (R. 44-45.) Further, although Plaintiff is able to fold and put laundry on hangars, in order to do so, she must be sitting and someone has to bring the laundry to her. (R. 92.)

 With regard to cooking, Plaintiff does "light cooking" (R. 45) and stated that she needs help lifting pans of water and cannot stand up for long periods. (R. 87, 100.) She says she makes cold salads or cooks quick, basic meals. (R. 87, 92.) She can drive, but due to numbness in her legs, cannot drive for more than five to ten minutes.[37] (R. 45.) If she goes to the grocery store, she points to the items she needs and someone else has to retrieve them and carry the grocery bags.  (R. 92.)

Plaintiff testified that she does not go to the movies or church because she cannot sit for the duration of the service or performance. (R. 46.) She stated that she was previously more involved with her son's baseball teams, but now only occasionally attends his games. (R. 93, 101.) Due to pain, she "seldom go[es] out unless [she] has

---

[37] Plaintiff testified to only driving for five to ten minutes at her hearing in 2003. In 2001, Plaintiff stated she could drive for twenty minutes, and in 2002, for fifteen to twenty minutes, before her legs became numb, stiff, and sore. (R. 93.) Despite this inconsistency in length of time, the statements are consistent with Plaintiff's claim that she cannot sit for extended periods of time and must change position to avoid these side effects. These statements may also be indicative of the worsening of Plaintiff's condition between 2001 and 2003.

to." (R. 101.) Plaintiff's statements that she reads, watches television, and paints for "a few minutes" are not inconsistent with her testimony that she suffers from disabling pain or that her pain makes it difficult for her to concentrate.[38] (R. 93.) Plaintiff testified that she spends thirteen hours a day lying in bed due to pain. Although she may read or watch television during that time she spends four to four and one-half hours during the day sleeping.

In sum, the ALJ's conclusory statement that Plaintiff's activities of daily living are inconsistent with her complaints of pain is not supported by the evidence in the record nor has the ALJ articulated specific reasons why the general activities of daily living are inconsistent with Plaintiff's complaints of pain. Accordingly, the ALJ's rejection of Plaintiff's complaints of pain was error because the ALJ failed to articulate explicit and adequate reasons for discrediting Plaintiff's complaints of disabling pain as he was required to do so under the Eleventh Circuit pain standard.

In addition, the ALJ's conclusion that the side effects of Plaintiff's pain medication do not severely impact her activities of daily living was not supported by substantial evidence. (R. 23.) The ALJ failed to offer any support for this conclusion and ignored the fact that Plaintiff testified she spends four to four and one-half hours during the day sleeping. Specifically, Plaintiff testified that she takes her medication three times a day and becomes drowsy within one half-hour after taking the medication. Plaintiff reported that due to pain or fatigue she could only perform a task for a short interval and then had to rest. Further, notes from Plaintiff's treating physician, Dr. DiSanti, also support

---

[38] The Court assumes that the reference to relationships with friends and family and ability to manage finances in the ALJ's opinion relates to Plaintiff's complaints of depression.

Plaintiff's claim that she is fatigued. Dr. DiSanti noted that the side effects of Plaintiff's narcotic medication and muscle relaxants include drowsiness, and that it was not surprising that Plaintiff needed to lay down often throughout the day. (R. 197.) And as discussed above, close scrutiny of the record with regard to Plaintiff's activities of daily living does not support the ALJ's conclusion that the pain medication does not impact activities of daily living.

As such, the Court also concludes that the ALJ's finding that Plaintiff's medication does not affect her activities of daily living was error because the finding is not supported by the substantial evidence in the record. Accordingly, on remand the ALJ should address the effects of Plaintiff's pain medication as it relates to the assessment of Plaintiff's RFC and Plaintiff's ability to perform sustained work activities.

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand the Commissioner should: (1) properly address the opinion of Plaintiff's treating physician, Dr. DiSanti; (2) assess Plaintiff's subjective complaints of pain in accordance with the Eleventh Circuit pain standard; (3) redetermine Plaintiff's RFC after proper assessment of Dr. Santi's opinion and after giving appropriate consideration to Plaintiff's complaints of pain; and (4) conduct any other proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 29, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel